## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| ROBERT E. CAMPBELL, MARIA-JOAQUINA WOMACK, and AURORA JOY CAMPBELL-ORTEGA, Plaintiffs | § § § § § | |
| | § | CIVIL ACTION NO. _____ |
| v. | § § | |
| CLINTON LEWIS and JEFFERY STEVEN SIMPSON, *both in their individual and official capacities as Police Officers for the City of Lubbock, Texas,* and CITY OF LUBBOCK, Defendants. | § § § § § § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs, Robert E. Campbell ["Campbell"], Maria-Joaquina Womack ["Womack"], and Aurora Joy Campbell-Ortega ["Ortega"], complaining of Defendants, Clinton Lewis ["Lewis"], Jeffery Steven Simpson ["Simpson"] and the City of Lubbock ["Lubbock"], respectfully show the following:

## I.      NATURE OF THE ACTION

1.      This is a civil rights action for damages arising under the Constitution of the United States (particularly the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States), under the laws of the United States (particularly the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988), and under the laws of the State of Texas, resulting from the brutal assault of Campbell by Officers Clinton and Lewis, City of Lubbock Police Officers, on July 7, 2009 and the wrongful arrest and malicious prosecution of Campbell, Womack, and Ortega.

## II.    DEMAND FOR JURY TRIAL

2.      Plaintiffs demand a trial by jury.

## III.    PARTIES, JURISDICTION, VENUE AND CONDITIONS PRECEDENT

3.      Plaintiffs, individuals, are citizens and residents of Lubbock, Lubbock County, Texas.

4.      Lewis is an individual citizen and resident of Texas and is and was employed by the City of Lubbock as a Police Officer. He can be served with Summons at his work address at the City of Lubbock Police Department, 916 Texas Ave., Lubbock, TX 79412.

5.      Simpson is an individual citizen and resident of Texas and employed by the City of Lubbock as a Police Officer. He can be served with Summons at his work address at the City of Lubbock Police Department, 916 Texas Ave., Lubbock, TX 79412.

6.      Defendant City of Lubbock is a political subdivision of the State of Texas, incorporated as a home rule municipality, and is the public employer of Defendants Lewis and Simpson. Service of Summons upon Defendant City of Lubbock may be had by serving the City Manager, Lee Ann Dumbauld, at 1625 13th Street, Lubbock, Texas 79401.

7.      Upon information and belief, Defendants Lewis and Simpson acted as agents and employees of the City of Lubbock and were in concert with each other and with the City of Lubbock at all times.  Further, upon information and belief, Defendants Lewis and Simpson were acting in the course and scope of the authority granted to them by the City of Lubbock and the State of Texas as law enforcement officers and City of Lubbock Police Officers.

8.      This Court has jurisdiction to hear the merits of Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1343(a) (3) and (4) and pendant jurisdiction to hear their claims under state law.

9.      Venue is proper under 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Texas.

10.     All conditions precedent have been performed or have occurred.

## IV.    FACTS

11.     At all times relevant to the acts alleged in this complaint, Defendants Lewis and Simpson were acting under the color of the statutes, ordinances, regulations, customs, and usages of Defendant City of Lubbock and the State of Texas and under the authority of their respective offices as police officers.

12.     On July 7, 2009, Plaintiff Campbell, a 63 year old honorably discharged Vietnam veteran of the United States Army and a former Deputy Sheriff of Lubbock County, was employed by Inter-Con Inc. as a Special Deputy United States Marshall at the United States District Court of the Western District of Texas as a contract deputy marshall performing security services at the Court. In addition, Campbell held a private Texas license to carry a concealed weapon and had his pistol concealed in his automobile when he went to work around eight o'clock a.m.

13.     Campbell got off work on July 7, 2009 and drove home to his residence located at 2116 Cornell St., Lubbock, Texas, (where he had lived for over sixteen years).   He arrived home around three to four o'clock p.m. Campbell pulled in to his property, passed his private fence line, and parked in his driveway. Campbell went inside his residence, took off his work shirt, and got a beer out of his refrigerator. Campbell sat in his house drinking a beer when one his neighbors, a lady named Michelle who resided at 2118 Cornell St (next door to Campbell), came into his home through the front door (which he had left unlocked) without knocking and started going through his refrigerator and taking out some beers. Michelle appeared obviously drunk; Campbell told her to get out and that she did not need any more beers as she was already drunk. Campbell told her that she had not knocked and that she needed to leave his house and leave him alone. Michelle started cussing angrily and calling Campbell foul names; Campbell then hit the

wall in his house to get her attention. Campbell then told her to leave again and she left. After drinking a few beers, Campbell then went to his front porch, sat in his lounge chair, and drank a beer.

14.     Around five-thirty p.m. on July 7, 2009, another neighbor, a lady named Dawn who resided at 2113 Cornell Street, was driving down Cornell Street.  She stopped her car on said street and it appeared that something had broken and one of the wheels had fallen out to the side. She got out of her car and talked with someone on the telephone, and then she started yelling at Campbell to come help push the car into her driveway out of the street. Campbell, staying on his porch, told Dawn that he had a bad back and could not help push the car. Campbell further told Dawn that she needed to call her husband and a wrecker because the visible damage affecting the wheel would likely make it impossible to just push the car into her driveway. Dawn appeared to get angry and started yelling and cussing at Campbell; Michelle then joined Dawn and they went into Dawn's house at 2113 Cornell Street and were cussing and yelling from inside the house.

15.     Plaintiff Womack, Campbell's fiancée, arrived home between seven and seven-thirty p.m. on the evening of July 7, 2009 and found Campbell still sitting on his own front porch. Campbell explained to Womack what had happened. Womack called 911 because she was concerned that the two neighbors (both of whom were still yelling and cussing), might start causing problems. Womack asked that a police officer come out to make sure that nothing happened and to ascertain what Campbell and Womack's rights were with regard to the two neighbors yelling and cussing at them. Womack was concerned because (upon information and belief) both Michelle and Dawn had a history of using illegal drugs and both had arrest and criminal records.

16.     After Womack called 911, Campbell called his daughter, Plaintiff Ortega, to see if she and her boyfriend could come over to fix Campbell's television. Campbell told Ortega that Womack had called 911; Ortega and her boyfriend came over to Campbell's house to straighten out the television programming and to make sure that Campbell and Womack were okay.

17.     After Ortega and her boyfriend arrived and were standing outside talking to Campbell and Womack, a Lubbock police car arrived on Cornell Street and parked in front of Campbell's house. Defendant Simpson, in his police uniform, got out of the Lubbock Police car, stood by the fence surrounding Campbell's yard, and started talking with Campbell and Womack. Ortega, her sixteen year old daughter (Campbell's granddaughter), Ortega's boyfriend, and his son were standing by the porch observing.

18.     Womack and Campbell, knowing that Womack had called 911, started explaining to Simpson what had happened with Dawn and Michelle and why Womack had called 911. Campbell explained to Simpson that Michelle had come into his house drunk and started taking beer out of his refrigerator. Campbell explained that Michelle would not leave and that he had to slam the wall to get Michelle's attention to get her to leave because she was cussing and yelling at him inside his own house. Campbell and Womack told Simpson that Campbell was working security at the Federal Court building, that Campbell was a former Deputy Sheriff of Lubbock County, and that Campbell had a license to carry a firearm to show that Campbell had experience in law enforcement and to establish some credibility with Simpson, a Lubbock Police Officer.

19.     While Simpson was talking with Campbell and Womack, the two neighbors, Dawn and Michelle, started yelling and cussing again from inside Dawn's house; Simpson said that he was going to go check out the noise and disturbance. Simpson then left and appeared to go inside Dawn's house. After Simpson left, Ortega's boyfriend and his son went inside Campbell's house

to work on the television, but Ortega and her daughter remained outside with Campbell and Womack.

20.     After Simpson had been gone for what seemed like quite a while, Campbell remembered that he had left his pistol in his vehicle parked in his driveway; he walked over to his vehicle, got his pistol, stuck it in his belt behind his back, and walked back up on his front porch intending to take his pistol into his house. Womack and Ortega were still outside talking; Campbell sat back down in his lounge chair only a couple of feet from his front door and joined in the conversation again for a short period of time. The pistol was behind his back completely hidden from view.

21.     Almost immediately after Campbell sat down, Defendants Simpson and Lewis hurriedly came back across the street from Dawn's house. Ortega and her daughter were standing outside with Womack next to the porch talking with Campbell who had just sat back down in his lounge chair. Defendant Simpson rushed up to the porch and started asking in a very angry tone of voice if Campbell had his identification on him. Womack was standing on the ground directly in front of Campbell and Simpson was standing on the sidewalk beside Womack. Defendant Lewis was standing just behind Simpson. Campbell told Simpson that Campbell did not have his identification on his person as he had left it in his house when he came home from work and took off his shirt. Campbell told Simpson that he would be glad to go inside his house and get his identification.

22.     Simpson told Campbell that he was going inside Campbell's residence with Campbell to get his identification; Campbell told Simpson in a very loud voice that Campbell knew his rights and that Simpson could not enter his house. As Campbell stood up from his lounge chair, he remembered that he had stuck his pistol in his belt behind his back; as a result, he did not turn around.  Instead, he walked backwards from his lounge chair the couple of feet to his front door,

opened the glass door without turning around, and backed into his house. Once he was inside his house, Campbell continued walking backwards until he reached his dining room table.  This act was performed 1) so that no one could see the pistol behind his back and 2) with the intentions of placing the pistol on the table and retrieving his identification.

23.     After Campbell went inside the house, Simpson stepped towards the house, appearing as if he were going to enter the house. Womack hurriedly stepped up on the porch, put her hand in front of the door, and told Simpson that Campbell had told him that he did not have permission to enter their house. Simpson grabbed Womack's arm, threw her off the porch, and entered the house. Defendant Lewis followed Simpson into the house, also ignoring the clear instructions that they did not have permission to enter the house of Campbell and Womack.

24.     Contrary to their statements in their police reports, neither Simpson nor Lewis ever drew their pistols prior to entering the house of Campbell and Womack. Further, neither Simpson nor Lewis ever observed any Plaintiff committing any crime; Plaintiffs were merely talking with each other on their own property. Further, the only person drinking beer was Campbell, who was sitting on his own front porch. Defendants Simpson and Lewis entered Plaintiffs' home without a warrant, without probable cause to believe that a crime was being committed (or was about to be committed), without consent, and without exigent circumstances. At no time did any of the Plaintiffs threaten the Defendant Police Officers or make any threatening gestures or comments.

25.     Once inside the house, one of the Defendants grabbed Campbell by the arms. The other Defendant hit Campbell upside the head twice and said "What are you going to do about that?"

26.     Womack got up, came into the house, saw blood on Campbell's head, and saw one of the Defendants holding Campbell's arms behind his back. Womack walked over to Campbell's side and started telling the Defendants that Campbell had a bad back and a bad heart and to leave

Campbell alone. All of a sudden the Defendant holding Campbell threw Campbell and Womack down onto the floor, hurting both of them. The Defendants were yelling at Campbell and Womack to put their hands behind their backs and one of the Defendants put his knee in Campbell's back to hold him down. After she hit the floor, Womack was asking the Defendants to stop and one of the Defendants was hitting Campbell in the face and head, breaking Campbell's nose, and blood was pouring out of Campbell's wounds.

27.     Ortega and Campbell's granddaughter were watching the events from outside through the window; when the Defendants threw Campbell and Womack down on the floor and were hitting Campbell, Ortega came into the house because she was worried about her father, Campbell, and Womack being injured. Ortega went to help Womack get up. One of the Defendants grabbed Ortega and she told him to let her go, and the Defendant proceeded to manhandle Ortega roughly.

28.     While Campbell was lying on the floor face down, bleeding, handcuffed, unable to move, and on the verge of losing consciousness (or already unconscious), one of the Defendants took out his Taser Conductive Energy Weapon ["Taser"] and shot Campbell in the back multiple times therewith, leaving Campbell lying unconscious in a pool of his own blood on his living room floor.

29.     The Plaintiffs were all eventually handcuffed and falsely arrested. Plaintiff Campbell's legitimately possessed weapons were illegally seized and his home illegally searched. Campbell was taken to the University Medical Center for treatment for his bleeding and injuries and was diagnosed with fractures of his sinus and bruises and contusions and a laceration of the forehead. Afterwards, he was taken to the jail. Ortega and Womack were taken directly to the jail.

30.    Campbell was charged with intentionally failing to conceal a handgun, carrying a loaded handgun while intoxicated, assault on a police officer, and intentionally preventing a police officer from effectuating his arrest. Criminal cases were then filed against him.

31.    Womack was charged with unlawfully interfering with a peace officer and a criminal case was filed against her.

32.    Ortega was charged with assault on a public servant, unlawfully resisting arrest and with unlawfully interfering with a peace officer.  A criminal case was filed against her.

33.    Before Campbell was even booked into the Lubbock County Jail, Campbell was told by Robbie Reno, Campbell's supervisor with InterCon Inc., that Campbell was terminated based on his arrest.  Robbie Reno did not even give Campbell a chance to explain the circumstances surrounding same. Later, Campbell was informed that his termination was changed to leave without pay and that Judge Cummings had said Campbell was not allowed to come back to work and that he would be fired. Campbell was placed on unpaid leave had no income, and no way to pay his bills (except to request payment for his accrued leave). After approximately nine months of no pay, Campbell was informed that the only way that he could get his accrued leave pay was to resign from his position. As a result, Campbell was forced to resign in order to obtain his accrued leave pay.

34.     All charges and all criminal cases against all Plaintiffs were eventually dismissed prior to any trials being held.

35.    Campbell and Ortega had never been arrested, had no criminal charges, and no criminal background prior to Defendants' unlawful entry and arrest.

36.    Defendants intentionally and maliciously lied in their police reports to cover up their actions of illegally entering Plaintiffs' home with no warrant, no consent, and no exigent

circumstances and to try to justify their actions, resulting in criminal prosecutions being filed against Plaintiffs with no probable cause.

**V.      COUNT I – Violation of 42 U.S.C. § 1983 Against Individual
Defendants Officers Simpson and Lewis**

37.     Plaintiffs adopt by reference the allegations set forth in paragraphs 1-36 as though fully set forth herein.

38.     Defendants Simpson and Lewis, acting under color of law, deprived Plaintiffs of certain constitutionally protected rights when they:

        a.      Made an unlawful entry into Plaintiffs' home without probable cause, without a warrant, without consent, and without exigent circumstances;

        b.      Conducted an unlawful search of Plaintiffs' home and an unlawful seizure of their property;

        c.      Made an unlawful arrest and unreasonable seizure of the Plaintiffs' persons;

        d.      Used excessive, unnecessary and unreasonable physical force as would shock the conscience to brutally accomplish the unlawful arrest and seizure of Plaintiffs through multiple separate acts (including but not limited to physically striking Campbell so forcefully in the face as to break his nose and deploying Defendant's Taser device multiple times when such action was unwarranted and unreasonable according to the circumstances in that Campbell was already prostrate on the floor unable to move, handcuffed, and unconscious or nearing unconsciousness).

39.     Defendants Simpson and Lewis acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiffs' clearly established constitutional rights.

40.     As a proximate result of the Defendants Simpson and Lewis's unlawful entry into the Plaintiffs' home, unlawful arrests, and use of excessive force, Plaintiff Campbell sustained

physical injuries which required medical treatment and left permanent scars. All Plaintiffs sustained damages for pain and suffering, mental anguish, and other damages as pled herein.

## VI.   COUNT II – Violations of 42 U.S.C. §§ 1983 Against Defendant City of Lubbock

41.    Plaintiffs adopt by reference the allegations set forth in paragraphs 1-40 as though fully set forth herein.

42.    Defendant City of Lubbock has established policies and procedures for its Police Department regarding the entry of residences and the use of force, including the use of Tasers.

43.    In establishing these procedures, Defendant City had a duty under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States to refrain from enforcing or continuing to effect policies and procedures that created a substantial likelihood that citizens would be subjected to unlawful seizures of their person and/or the use of excessive force by Defendant City's Police Department officers.

44.    Notwithstanding its mentioned duties, Defendant City was (upon information and belief) guilty of one or more of the following wrongful acts or omissions in violation of the Plaintiff's constitutional rights, in that it:

a.    Allowed policies and procedures to continue in force and effect which resulted in the wrongful entry of Plaintiffs' residence and the use of outrageous and excessive force against Plaintiff Campbell;

b.    Had a custom and practice of failing to independently and adequately investigate complaints of wrongful entry of residences and of excessive force;

c.    Had a custom and practice of failing to effectively discipline or retrain police officers who wrongfully entered residences or utilized excessive force;

d.     Failed to establish appropriate policies and procedures to address and correct the wrongful entry of residences and the repeated use of excessive force by police officers in use of Tasers, including the fact that the City of Lubbock had deliberately chosen not to document and evaluate the use of Tasers by its officers against individual citizens;

e.     Failed to establish adequate policies and procedures regarding the proper use of the Taser device as a use-of-force option; and

f.     Failed to adequately train its police officers regarding the entry of residences and the use of the Taser device on persons who were passively noncompliant to the demands of those officers.

Upon information and belief, at the time of the events in question, the City of Lubbock had intentionally and willfully refused to give its officers appropriate rules and limitations on the wrongful entry of residences and the use of Tasers in order to give the City and its officers a convenient excuse and "plausible denial" in the event that the use of a Taser was questioned. This was inherently irresponsible considering the problems that the City of Lubbock has had with inappropriate Taser usage.[1]

45.     As a direct and proximate result of one or more of Defendant City's wrongful acts or omissions, Plaintiffs sustained a violation of their rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

46.     Defendant City acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiffs' clearly established constitutional rights.

---

[1] *See, e.g.*, *Nunez v. City of Lubbock*, Case No. 5:07-00032-C (N.D. Tex. 2007); *McCallan v. City of Lubbock*, USDC Case No. 5:06-cv-00264-C (N.D. Tex. 2006); *Hereford v. State of Texas*, No. 07-08-0315-CR (Tex. App. – Amarillo, December 30, 2009); *Sarabia v. City of Lubbock and Officer Sadie Hockenberry*, Case No. 5:10-cv-00006-C (N.D. Tex. 2010).

47.    As a proximate result of the Defendant City of Lubbock's actions, Plaintiff Campbell sustained physical injuries from excessive use of force which required medical treatment and left permanent scars. Further, all Plaintiffs suffered damages for pain and suffering, mental anguish, and other damages as pled herein.

## VII.    COUNT III – Texas State Law Assault against Defendants Officers Simpson and Lewis

48.    Plaintiffs adopt by reference the allegations set forth in paragraphs 1-47??? as though fully set forth herein.

49.    When Officers Simpson and Lewis attacked Plaintiff Campbell with their hands and with a Taser, the contact amounted to a physical assault on the person of the Plaintiff. Officers Simpson and Lewis committed this assault intentionally, knowingly, or recklessly, and their actions resulted in bodily injury to the Plaintiff Campbell.

50.    The injuries resulting to the Plaintiff Campbell, and the damages associated therewith, as more particularly described hereinabove, were proximately caused by the assault committed against Plaintiff by Officers Simpson and Lewis. The other Plaintiffs were caused emotional harm and mental anguish in their observation of the assault.

## VIII.    COUNT IV – Texas State Law Malicious Prosecution against Defendants Officers Simpson and Lewis

51.    Plaintiffs adopt by reference the allegations set forth in paragraphs 1-50 as though fully set forth herein.

52.    Criminal prosecutions were commenced against Plaintiffs and Defendants Simpson and Lewis initiated or procured the prosecutions with their false statements.

53.    The prosecutions terminated in Plaintiffs' favor, as they were all dismissed.

54.    Plaintiffs were innocent of the charges.

55.     Defendants Simpson and Lewis lacked probable cause to initiate the prosecutions as the prosecutions were obtained through the false statements of Simpson and Lewis, the illegal entry into the home of Plaintiffs, and the illegal seizure of Plaintiffs.

56.     Defendants Simpson and Lewis acted with malice in instituting the prosecutions.  More specifically, they entered Plaintiffs' home knowing that they had no right to do so and attempted to cover up their illegal acts that deprived Plaintiffs of their respective civil rights under color of law.

57.     Plaintiffs suffered damages. Campbell lost his job and all Plaintiffs suffered mental anguish, damage to their reputations, and other damages.

## IX.     LACK OF QUALIFIED IMMUNITY

58.     The lack of concern exhibited by Officers Simpson and Lewis about "Tasing" someone already rendered helpless coupled with the severe physical beating administered thereby evidence a "rather cavalier attitude towards the use of a weapon known to inflict pain, cause burns, and 'always' involve the risk of death." Further, being subjected to 50,000 volts of electricity is not a common, everyday occurrence, and use of a Taser against a non-aggressive subject has been judicially characterized as being equivalent to whipping or beating an individual with a cane or club.

59.     Plaintiff Campbell's purported offenses in this matter provide little or no basis for Officers Simpson and Lewis use of force, and the offenses that he was accused of militate against finding Officers Simpson and Lewis's use of significant force to effect the arrest of Plaintiff Campbell reasonable where Plaintiff Campbell was nonviolent and posed no threat to the safety of officers or others prior to the illegal acts of the Defendants. Officers Simpson and Lewis's actions violated "clearly established statutory or constitutional rights of which a

reasonable person would have known." No reasonable officer confronting a situation where the need for force was absent, or at its lowest, as in this situation, would have concluded that deploying even intermediate force under such circumstances was reasonable, and therefore Officers Simpson and Lewis should not be entitled to any protection of Qualified Immunity to avoid accountability in this case.

## X.    DAMAGES

60.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs suffered deprivations of their constitutional rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

61.    In addition, Plaintiff Campbell incurred reasonable and necessary medical bills for treatment of his injuries and damages for disfigurement in the past and in the future.

62.    Plaintiff Ortega's planned career was ruined by her arrest and the criminal cases filed against her.  As a result thereof, she was unable to continue her education in the field that she had been pursuing.

63.     Plaintiff Womack had to give up her job to take care of Plaintiff Campbell due to his stress, anxiety, and suffering caused by Defendants.

64.    Plaintiffs all incurred substantial additional damages for loss of reputation, shame, embarrassment, humiliation, mental anguish, pain and suffering, and such other compensatory and tangible consequential damages as the law entitles Plaintiffs to recover.

65.    Plaintiffs hereby sue for these damages, and pray for just and fair recovery thereof.

## XI.   ATTORNEY'S FEES

66.    It was necessary for Plaintiffs to hire the undersigned attorneys to file this lawsuit. Plaintiffs are entitled to an award of attorney fees and costs under 42 U.S.C. § 1988(b).

## XII.   <u>PRAYER FOR RELIEF</u>

67.   For the reasons stated, Plaintiffs request judgment against Defendants for the following:

  a.      Actual damages in an amount to be proved at trial;

  b.      Prejudgment and postjudgment interest;

  c.      Costs of suit, including attorney fees; and

  d.      All other, further and different relief as this Court deems just and proper.

DATED this 6th day of July 2011.

Respectfully submitted,


By:  s/ Kervyn B. Altaffer Jr.
Kervyn B. Altaffer Jr.
State Bar No. 01116575
Law Office of Kervyn B. Altaffer Jr.
P.O. Box 153071
Austin, TX 78745
Tel: 972-948-5385
Fax: 512-852-4578
Email: skycanoe@hotmail.com

William Pieratt Demond
 State Bar No. 24058931
Email: william.demond@demondhassan.com
Meagan Hassan
State Bar No. 24065385
Email: meagan.hassan@demondhassan.com
Demond & Hassan, PLLC
2800 Post Oak Boulevard, Suite 4100
Houston, Texas 77056
Tel: (281) 904-2338
Fax: (512) 519-2495

**ATTORNEYS FOR PLAINTIFFS**