IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

LUBBOCK DIVISION

| | | |
|---|---|---|
| ROBERT E. CAMPBELL, MARIA-JOAQUINA WOMACK, and AURORA JOY CAMPBELL-ORTEGA, | § § § § | |
| Plaintiffs, | § | |
| vs. | § § | CIVIL ACTION # 5:11-CV-116-J |
| CLINTON LEWIS and JEFFERY STEVEN SIMPSON, *both in their individual and official capacities as Police Officers for the City of Lubbock, Texas,* and the CITY OF LUBBOCK, Texas, | § § § § § § | |
| Defendants. | § | |

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendants Clinton Lewis' and Jeffery Simpson's motion for summary judgment on the basis of an entitlement to qualified immunity from all of the claims asserted herein by Plaintiffs Robert Campbell, Maria-Joaquina Womack and Aurora Campbell-Ortega.   Plaintiffs have filed their response in opposition to this motion.   For the following reasons, Defendants' motion is denied.

### *Summary Judgment Standards*

A court may terminate litigation by rendering a summary judgment where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (initial burden is on movant to show entitlement to summary judgment with competent evidence).   A material fact issue is one that might affect the outcome of the suit under the governing law.   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91

L.Ed.2d 202 (1986).   The substantive law governing the case will identify which facts are material. *Id.,* 477 U.S. at 249, 106 S.Ct. at 2510.   The party opposing judgment must point the Court to "specific facts with sufficient particularity to meet all the elements necessary to lay a foundation for recovery, including those necessary to negate the defense" offered by movant. *Brown v. Texas A&M University,* 804 F.2d 327, 333 (5th Cir. 1986)./[1]

"Summary judgment disposition is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions." *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir. 1987).   This Court must resolve "all factual uncertainties and mak[e] all reasonable inferences in favor of the nonmoving party." *Id.; Bienkowski v. American Airlines,* 851 F.2d 1503, 1504 (5th Cir. 1988).   If a rational trier of fact based upon the record as a whole could not find for the non-moving party, there is no genuine issue for trial. *Amoco Prod. Co. v. Horwell Energy, Inc.,* 969 F.2d 146, 147-48 (5th Cir. 1992).

"Finally, where the non-moving party has presented evidence to support the essential elements of its claims but that evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby, Inc.,* 477 U.S. at 249-50, 106 S.Ct. at 2510-11 (1986)(citations omitted).   Legal conclusions and general allegations do not satisfy this burden. *Id.,* 477 U.S. at 250, 106 S.Ct. at 2511; *Lechuga v. Southern Pacific Transp. Co.,* 949 F.2d 790, 798 (5th Cir. 1992)(conclusory statements do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment); *Galindo v. Precision Am. Corp.,* 754 F.2d 1212, 1216 (5th Cir. 1985)(ultimate or conclusory facts are insufficient to either support or defeat a motion for

---

[1]   *Accord Liberty Lobby, Inc., supra,* 477 U.S. at 247-49, 106 S.Ct. at 2510 (1986); *Celotex Corp., supra,* 477 U.S. at 323-25, 106 S.Ct. at 2553 (1986).   The nonmoving party must designate specific facts showing there exists a genuine issue of material fact on those elements sought to be negated by the movant. *Ibid.*

summary judgment).

*Qualified Immunity Standards*

Qualified immunity shields government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  More precisely, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right ... in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).  As the Fifth Circuit has held, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances."  *See Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997)(internal quotation and citation omitted).

The Court should view the facts in favor of the plaintiffs.  *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151 (2001)("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry."); *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).  Qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991)(citation and internal quotation omitted).

Until 2009, courts resolved government officials' qualified immunity claims under the two-part test mandated by the Supreme Court in *Saucier v. Katz*, deciding:  (1) first whether facts alleged or shown by plaintiff make out the violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct. *See*

3

*Saucier*, 533 U.S. at 201 (2001); *Sorenson v. Ferrie*, 134 F.3d 325, 328 (5th Cir. 1998). The Supreme Court revisited that rule in 2009, determining that the rigid two-step structure was no longer mandatory. *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572 (5th Cir. 2009)(citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)). Accordingly, as the Court did in *Pearson*, the court may first consider whether the officer's conduct violated clearly established law. *Pearson, supra,*. 555 U.S. at 234-44, 129 S.Ct. at 822 (2009). If the answer is no, then qualified immunity shields defendants from suit.

### *Claims Raised in this Lawsuit*

Plaintiffs sue Defendants Lewis and Simpson in their official and individual capacities pursuant to 42 U.S.C. § 1983. Plaintiffs' individual capacity claims are that the Defendants Lewis and Simpson: 1) made an unlawful entry into Plaintiffs Campbell's home without probable cause, without a warrant, without consent, after an express denial of consent to enter, and without exigent circumstances; 2) after entry, conducted an unlawful search of the home and an unlawful seizure of Plaintiffs Campbell's property; 3) made an unlawful arrest and unreasonable seizure of the Plaintiffs' persons, 4) used excessive, unnecessary and unreasonable force in assaulting, arresting and seizing Plaintiff Campbell, all of which 5) resulted in the wrongful arrest and malicious prosecution of Plaintiffs Campbell, Womack, and Campbell-Ortega.

Plaintiffs' official capacity claims are asserted against both police officers and their employer, the City of Lubbock, Texas. Plaintiffs further allege state-law-based assault and malicious prosecution claims against Lewis and Simpson in their individual capacities only, as well as intentional and/or reckless state law personal injury tort claims./[1]

---

[1]     Malicious prosecution actions are not favored in Texas law. *Browning-Ferris Industries, Inc. v. Lieck*, 881 S.W.2d 288, 290-91 (Tex. 1994). This is because there is a delicate balance between the

In particular, Plaintiffs allege that *after* Robert Campbell was handcuffed and completely under the control of the Defendant officers, Campbell was subjected to one or two additional electrical discharges of the Officer Lewis' Taser Conductive Energy Weapon (Taser) weapon, which force they allege was clearly excessive to the need for use of force, and wholly unnecessary under the totality of the circumstances of the arrest. Plaintiffs have tendered competent summary judgment evidence in support of their allegations.

Plaintiffs allege that Campbell's purported offenses in this matter provide little or no basis for Officers Simpson and Lewis' use of any force. The minor assault of which he might have been accused, which he denies, was done outside the presence of either officer. Plaintiffs argue that the fact that Campbell was not charged militates against a finding that Simpson and Lewis' use of significant force to effect the arrest of Plaintiff Campbell was reasonable. Plaintiffs argue that Campbell was at all relevant time nonviolent, was not intoxicated, and that the officers admitted in their depositions that Campbell posed no threat to the safety of the officers or others. Plaintiffs argue that no reasonable officer confronting a situation where the need for force was absent, or was, at most, at its lowest level, as in this situation, would have concluded that deploying even intermediate force under such circumstances was reasonable. Therefore, they argue, Simpson and Lewis should not be entitled to qualified immunity to avoid accountability in this case.

Defendants deny they tasered Campbell *after* he was handcuffed, deny that they tasered him more than twice, deny that they tasered three times, and can only speculate why their Taser

---

interest of society in the efficient enforcement of the criminal law and the interest of the individual to be protected against unjustifiable and oppressive litigation. *Id.* To prevail on a claim of malicious prosecution, a plaintiff must establish the following: (1) commencement of a criminal prosecution against the plaintiff; (2) initiated or procured by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the defendant's lack of probable cause to initiate the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997).

weapon's internal discharge log recorded three electrical discharges were made at the time of the arrest.

Except as otherwise specifically indicated, the following facts are supported by Plaintiffs' competent summary judgment evidence. The relevant facts underlying the three arrests at issue in this case are disputed by the parties.

### Background Facts

On July 7, 2009, Officers Jeffery Simpson, approximately 28 years of age, and Clinton Lewis, age 32, responded to a call arising from a public disturbance incident outside Plaintiff Robert Campbell's home. Both officers were commissioned peace officers for the City of Lubbock, Texas, and were acting in the course and scope of their official duties. Officer Simpson, who responded first, was on the last day of his 18-month probationary period as a new police officer. Simpson was responding to a neighborhood disturbance call at the specific behest of Plaintiff Maria Womack. Womack did not reside at the home./[2]

Simpson arrived and found Campbell, age 63, in his front yard with his fiancé Womack. Campbell informed Simpson that he, Campbell, was a Special Deputy United States Marshal working as a federal court security officer, a former law enforcement officer (Deputy Sheriff with the Lubbock County Sheriff's Office), and the holder of a Texas concealed handgun license permitting him to carry a concealed handgun in public places. Simpson did not inquire as to whether or not Campbell then had a firearm on his person.

Campbell informed Simpson that he was in his house drinking a beer when one of his

---

[2]     Womack alleges that she called 911 because she was concerned that two of Campbell's neighbors (named Michelle and Dawn, both of whom were yelling and cussing), might start causing additional problems. Womack requested a Lubbock police officer come out to the home to make sure that nothing happened, and to ascertain what Campbell and Womack's rights were with regard to the two neighbors yelling and cussing at them. Womack was also concerned because she believed that both Michelle and Dawn had a history of using illegal drugs, and that both had arrest and criminal records.

neighbors, a woman named Michelle, who resided next door to Campbell, came into his home through the front door (which he had left unlocked), without knocking, and started going through his refrigerator and taking out beers. Michelle appeared to Campbell to be obviously drunk. Campbell told her to get out, and that she did not need any more beers as she was already drunk. Michelle then started cussing angrily and calling Campbell foul names. Campbell told her to leave again, and she left. After she left, Campbell went to his front porch, sat in his lounge chair, and continued drinking a glass of beer.

Womack arrived at the home. She spoke to Campbell and, against his advice and instructions, called 911. Campbell then called his daughter, Plaintiff Aurora Campbell-Ortega, to see if she and her boyfriend could come over to fix Campbell's television. Campbell told Campbell-Ortega that Womack had called 911. Campbell-Ortega and her boyfriend came over to Campbell's house intending to straighten out the television's programming, and to make sure that Campbell and Womack were okay.

Campbell-Ortega and her boyfriend had arrived, and were standing outside talking to Campbell and Womack, when Officer Simpson arrived. Simpson, in his police uniform, turned on the audio and video recording equipment in his Lubbock Police car, then went over to talk to Campbell and Womack. Campbell-Ortega, her sixteen-year-old daughter (Campbell's grand-daughter), Ortega's boyfriend, and the boyfriend's son were standing by the front porch witnessing these events.

While Simpson was speaking with Campbell and Womack about the reason for the police call, Campbell's neighbors again started yelling and cussing from inside a neighbor's house. Shortly after he arrived on scene, and after Simpson had spoken very briefly with Campbell and Womack, Simpson interrupted that conversation by saying that he was going to go check out the cussing, yelling, noise and public disturbance. Simpson then left Campbell's front yard.

Simpson went into the neighbor's home.  Defendants allege that one of the neighbors involved in the public disturbance had a reddened area or mark on the side of her face.  They allege that she reported to Simpson that Campbell had struck her in the face with an unopened beer can.  Campbell denies that he struck anyone.  Simpson testified at his deposition that he intended to return to Campbell's home to investigate what, Simpson alleges, reasonably appeared to him to have been an assault case.

When Officer Simpson first arrived on the scene, according to the deposition testimony of Campbell, Campbell was unarmed.  While Simpson was visiting with Campbell's neighbors, Campbell went to his pickup, which was parked in his front driveway, inside his front yard fence, retrieved his semiautomatic pistol which was locked inside his vehicle, placed it in the back of his trousers under his waistband, and returned to his home, intending to place the pistol inside his house.  However, he did not go directly into his home, but instead sat back down on the front porch in a chair approximately two feet, or less, from his front door.  All parties agree that Campbell's pistol was behind his back, completely hidden from view while he sat on the porch.

As Simpson returned from a neighbor's home, he was joined by Officer Lewis.  The officers briefly conferred.  Lewis and Simpson approached Campbell at his front porch.  Simpson asked Campbell for his identification.  Campbell replied that it was inside his home, and indicated or stated that he would go retrieve it for Simpson.  From this point on, the parties' allegations of fact differ significantly.

Plaintiffs state that almost immediately after Campbell sat down on the porch after retrieving his pistol, Simpson and Lewis hurriedly came back across the street.  Simpson rushed up to the porch and started asking Campbell in a very angry tone of voice if Campbell had his identification on him.  Campbell told Simpson that he did not have his identification on his person because he left it inside his house when he came home from work.  Campbell told

Simpson that he would be glad to go inside his home and get his identification./[3]

Simpson told Campbell that he was also going inside Campbell's residence, with Campbell, to get his identification, but that Campbell told Simpson in a very loud voice that he knew his rights or that he knew the law, and that Simpson could not enter his home. Officer Lewis testified that Campbell was standing up, with his left hand on the front door's handle, fully facing the officers, as he denied them permission to enter his home. Campbell then went over the threshold into his home to retrieve his identification. The entire conversation between Simpson and Campbell lasted approximately one to two seconds.

As Campbell stood up from his lounge chair, he remembered that he had stuck his pistol in his belt behind his back. As a result, Campbell did not turn around. Instead, he stepped backwards from his lounge chair the one and a half to two feet to his front door, opened the glass door without turning around, and backed into his house. Once he was fully inside his house, Campbell continued walking backwards until he reached his dining room table, where he laid the pistol down on the table and immediately walked back into his living room. He states that he did that so no one could see the pistol behind his back, and with the intention of placing the pistol on the table and retrieving his identification, pursuant to Simpson's request.

After Campbell went inside his house, Simpson stepped towards the house, appearing as if he were going to enter the house. Womack hurriedly stepped up on the porch, put her hand in front of the door, and told Simpson that Campbell had already told him that he did not have permission to enter their house. Simpson grabbed Womack's arm, threw her off the porch, and entered the house anyway. Lewis followed Simpson into the home, ignoring Campbell's and

---

[3]      At this time, Plaintiffs allege that Campbell-Ortega and her daughter were standing outside the home with Womack, next to the porch, and were talking with Campbell, who had just sat back down in his lounge chair. Womack allegedly was standing on the ground directly in front of Campbell, and Simpson was standing on the sidewalk beside Womack. Lewis was standing just behind Simpson.

Womack's instructions that they did not have permission to enter the house. Then, after both were inside the home, the officers first drew their weapons.

The officers contend, on the other hand, that Campbell was told by Simpson to verbally identify himself, which implied he was not to go in his home, and that they would get to his driver's license later. They state that as Campbell was departing his front porch, he turned while crossing over his threshold to enter his front door. The officers then observed the grip of Campbell's pistol, and started yelling "gun" and "show me your hands." The officers state that they immediately drew their weapons and ordered Campbell to "halt," and that Campbell refused and continued into his house, ordering the officers in a profane manner to stay out of his house.

The officers allege in their summary judgment response, and testified, that they continued to verbally demand that Campbell stop and allow his weapon to be taken from him, to show them his hands (one of which was, they admit, on the door handle and the other holding a glass of beer). They say that Campbell rudely refused to comply, and proceeded inside through his living room into his kitchen, at which time he pulled the pistol from his pants with his right hand, placing it on the kitchen table beside a revolver already there. They say that Campbell then turned and immediately returned into his living room, traveling twenty feet or more from the front door to the kitchen table and back ten feet or so into the living room. There he was confronted by both officers, continued to resist their verbal commands and efforts to secure his person, and had to be forcibly subdued. Defendants admit Campbell was tasered twice, but say only then was he placed in handcuffs.

Plaintiffs say the Defendant officers did not ask Campbell to voluntarily relinquish control of his firearm either outside or once they were inside his home. Plaintiffs state that, contrary to the officers' statements in their official police reports, neither Simpson nor Lewis ever drew their pistols before entering the home. Officers Simpson and Lewis admitted in their

depositions that neither Simpson nor Lewis ever verbally commanded Campbell to stay outside, specifically ordered him to not go inside his home, informed Campbell that he was under suspicion of assault, or under investigation for any crime, or that he was under arrest.

Until the point that Campbell entered his home, it is undisputed that neither Simpson nor Lewis had observed any Plaintiff commit a crime.  It is undisputed that what the officers had observed was that the Plaintiffs were merely talking with each other on their own property. Further, it is undisputed that only Plaintiff Campbell was drinking a beer.  While the officers contend that Campbell appeared to them to be "possibly" intoxicated, Campbell specifically denies that he was intoxicated./[4]  It is undisputed that at no time did any of the Plaintiffs threaten the officers, or make any threatening gestures or comments to the officers, or any other person.

Plaintiffs say that once inside the home, in the living room, one of the Defendants grabbed Campbell by the arms.  The other Defendant then hit Campbell upside the head, twice, and said, "What are you going to do about that?"

Womack came into the house, saw blood on Campbell's head, and saw one of the Defendants holding Campbell's arms behind his back.  Womack walked towards Campbell's side, telling the officers that Campbell had a bad back and a bad heart, and telling them to leave Campbell alone.  Allegedly, all of a sudden, one of the Defendant holding Campbell threw Campbell and Womack down onto the floor, hurting both of them.

The Defendants were yelling at Campbell and Womack to put their hands behind their

---

[4]      Defendants refer to the hospital records as evidence of Campbell's intoxication.  The UMC Health System ER Physician Documentation's intake reports states that "Per Police … the patient [Campbell] admitted to having 6 beers," presumably between 3:30 to 4:00 pm until he presented at the emergency room at 11:05 pm.  The preliminary lab report on Campbell states that he was negative for drugs of abuse and his "alcohol level" was "159 mg/dL N/A" at 11:09 pm on July 7, 2009.  The hospital records state that Campbell was both 63 and 65 years of age, weighed 79.83 kg (approximately 176 lbs.), and was 5 feet 10 inches tall.  He suffered from hypertension and degenerative disks in his spine.  He presented with lacerations to the front and back sides of his head , fractured sinus bones, a blow to his temple, bruises and contusions, taser incisions in his mid-back, and abrasions to the back of his head.

backs. One of the Defendants put his knee in Campbell's back to hold him down. After she hit the floor, Womack kept asking the Defendants to stop, while one of the Defendants was hitting Campbell in the face and head, breaking Campbell's nose, and blood was pouring out of Campbell's head wounds.

Campbell-Ortega and Campbell's granddaughter were watching these events from outside through the front window. When the officers threw Campbell and Womack down on the floor and were hitting Campbell, Campbell-Ortega came into the house because she was worried about Campbell and Womack being injured. Campbell-Ortega went to help Womack get up, but one of the Defendants grabbed Campbell-Ortega. She told him to let her go, whereupon the officer allegedly proceeded to manhandle Campbell-Ortega roughly.

Plaintiffs allege that while Campbell was lying on the floor face down, bleeding, already handcuffed, unable to move, and on the verge of losing consciousness (or already unconscious), Defendants Lewis took out his taser and shot Campbell in the back multiple times, leaving Campbell lying unconscious in a pool of his own blood on his living room floor. Lewis admits tasering Campbell twice in his back while he was laying on the floor. The medical records indicate that taser probes were removed from Campbell's mid-back area.

The officers admit to using multiple hand strikes to Campbell's face, and to use of the taser weapon to subdue and apprehend Campbell, and take him into custody. The officers admit that Campbell received injuries to his face for which he received treatment at a local emergency room. During the struggle to seize Campbell, Defendants contend that Womack and Campbell-Ortega interfered with the officers' arrest of Campbell.

Defendants do not contend that Campbell resisted arrest after being verbally informed that he was going to be arrested, or evaded arrest. Simpson and Lewis both conceded in their depositions that they both thought Campbell went inside to retrieve his ID, and that neither

12

Simpson nor Lewis ever verbally informed Campbell of their intent to handcuff or arrest him. Defendants contend, however, that the officer had to deploy and discharge the taser weapon, twice, into Campbell's back in order to get Campbell into handcuffs, because: a) Lewis was getting tired during the struggle, b) Campbell initially resisted their attempts of handcuff him, and c) Campbell appeared to Lewis to be trying to get up off the floor, before he was handcuffed, but after he had been tasered the first time.

All three of the Plaintiffs were handcuffed and, they allege, falsely arrested, charged and prosecuted. Plaintiff Campbell alleges that his legally possessed weapons were illegally seized, and that his home was illegally searched by the Defendant officers and/or other Lubbock police officers. Campbell was taken to the University Medical Center hospital in Lubbock, Texas, for treatment for his bleeding nose, head lacerations, and other injuries. He was diagnosed with fractures of his sinus, with bruises, abrasions and contusions, and head lacerations. Afterwards, Campbell was taken to the jail. Campbell-Ortega and Womack were taken directly to the jail.

Campbell was charged with intentionally failing to conceal a handgun, carrying a loaded handgun while intoxicated, assault on a police officer, and intentionally preventing a police officer from effectuating his arrest. Campbell was not charged with an assault on his neighbor. Womack was charged with unlawfully interfering with a peace officer, and a criminal case was also filed against her.

Campbell-Ortega was charged with assault on a public servant, unlawfully resisting arrest, and unlawfully interfering with a peace officer. A criminal case was also filed against her. Before this Campbell-Ortega had never been arrested, had no criminal charges brought against her, and had no criminal background.

All charges and criminal cases against all three Plaintiffs were eventually dismissed, before any trials were held. As a result, Plaintiffs allege that they had no opportunity to clear

their names of the wrongful arrests, false charges and the resulting stigma. Plaintiff Campbell allegedly immediately lost his federal court security officer's job as a direct result of the false arrest. At the time of the incident he was receiving Veteran's Administration disability benefits.

Plaintiffs allege that to procure the criminal charges, Defendants Simpson and Lewis intentionally and maliciously lied in their police reports to cover up their actions of illegally entering Plaintiffs' home with no warrant, no consent, and no exigent circumstances. The falsifications were committed in an effort to justify their actions, so criminal charges would be filed against all Plaintiffs, and without probable cause to believe that any of them had committed any of the crimes charged.

### Discussion and Analysis

Plaintiffs allege that Defendants Simpson and Lewis entered the Plaintiffs' home without a warrant, without probable cause to believe that a crime was being committed (or was about to be committed), without consent, after a firm and express denial of consent to enter, and in the absence of any exigent circumstances. They argue that all subsequent illegal actions flowed from that illegal entry. Plaintiffs allege that once inside the home, Defendants further violated their constitutional rights to be free from: 1) use of excessive force, 2) unreasonable searches, and 3) unreasonable seizures. Plaintiffs also allege Defendants violated Campbell's Constitutional right to keep and bear arms./[5]

---

[5] Plaintiffs also argue that their U.S. constitutional right to keep and bear arms inside one's home was clearly established by July of 2009. The Court need not resolve that issue to rule on this motion. While it is correct to say that that right was clearly established by 2009 for a home located inside a federal district, *see District of Columbia v. Heller*, 554 U.S. 570 (2008)(holding that the Second Amendment protects the right to keep and bear arms in the home in Washington, D.C., for the purpose of self-defense), and that in the Fifth Circuit the Second Amendment protected Americans in their *individual* right to keep and bear arms, *U.S. v. Emerson*, 270 F.3d 203, 259-61 (5th Cir. 2001), it was not clearly established at that time that the *Second Amendment* individual right to keep and bear arms also applied to the states. That issue was not finally clear until the Supreme Court's 2010 decision in *McDonald v. City of Chicago*, ___ U.S. ___, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)(holding the Fourteenth Amendment

14

By July of 2009, Plaintiffs' right were clearly established to be free from 1) unreasonable seizures, *see Tennessee v. Garner,* 471 U.S. 1, 4, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Terry v. Ohio,* 391 U.S. 1, 8-9 (1968); 2) the use of excessive force, pursuant to the Fourth Amendment's prohibition against unreasonable seizures of the person, see *Graham v. Connor,* 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), *Saucier, supra,* 533 U.S. at 201-202 (2001) ("In this [excessive force] litigation, for instance, there is no doubt that *Graham v. Connor, supra,* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."); and 3) warrantless entries into a home without exigent circumstances, *see Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 1374-75 (1980)(holding the Fourth Amendment prohibits state police officers from making warrantless and nonconsensual entry into suspect's home in order to make routine felony-arrest),. Since each of these three rights were clearly established by the time of the incident in question, the Court will address whether the acts as alleged by Plaintiffs, and the summary judgment evidence tendered by the Plaintiffs, are sufficient to show the alleged violations of constitutional rights.

---

incorporates the Second Amendment right, recognized in *Heller,* to keep and bear arms in the home for the purpose of self-defense; thus the Fourteenth Amendment makes the Second Amendment right to keep and bear arms fully applicable to the States). In Texas, of course, it has long been clear that an individual does not need a state-granted license to have or carry a handgun, because Texas' constitutional right to keep and bear arms includes the right of the individual to have and carry on or in his home a handgun for the protection of his person, home and property, as well as the collective right of the people to keep and bear arms. *See State of Texas v. Duke,* 42 Tex. 455 (1874)(stating it is "settled authority" that both the federal constitution's Second Amendment and the Texas Bill of Rights' Section 13 provides an individual right to keep and bear arms, and that as a matter of Texas constitutional law it is settled law that it is the individual's right to keep and bear arms in his home and on his property). *Accord English v. State of Texas,* 35 Tex. 473 (1871).

*Entry into the Home and Resulting Search and Seizure of Persons and Property*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. For purposes of the Fourth Amendment, a "search" occurs when the government violates a subjective expectation of privacy that society considers objectively reasonable. *See Kyllo v. United States,* 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). The party alleging a violation of the Fourth Amendment must first show that he personally had a reasonable expectation of privacy that the government invaded. *Rakas v. Illinois,* 439 U.S. 128, 139, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A resident homeowner has subjective expectation of privacy inside his or her home that society considers objectively reasonable. *Oliver v. United States,* 466 U.S. 170, 176, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, the Supreme Court has inferred that a warrant must generally be secured. "It is a 'basic principle of Fourth Amendment law,' we have often said, 'that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)(quoting *Groh v. Ramirez,* 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004)). "But we have also recognized that this presumption may be overcome in some circumstances because '[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City, supra,* at 403, 126 S.Ct. 1943; *see also Michigan v. Fisher,* 558 U.S.___, 130 S.Ct. 546, 548, 175 L.Ed.2d 410 (2009)(*per curiam*). Accordingly, the warrant requirement is subject to certain reasonable exceptions, *Brigham City, supra,* at 403, 126 S.Ct. 1943 (2006), which the court will address at length in another section of this memorandum opinion and order.

Pursuant to Lubbock police policies, Simpson was the lead officer on the scene because

16

he responded first to the call.  It is undisputed that neither of the officers had a warrant to arrest anyone, or one that would permit them to legally enter the home and/or search it.  Officer Simpson testified in his deposition that, at the time of these events, he had not received police training in obtaining either an arrest warrant or a search warrant.  Any warrantless search and seizure of property and persons inside a home is "presumptively unreasonable." *Payton, supra,* 445 U.S. at 586 (1980).  "[P]olice bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin,* 466 U.S. 740, 749-750 (1984).

It is not disputed that Campbell firmly told both Defendants they could not enter his home.  Under Texas law, that denial of consent represented a valid "manifestation of his intent to restrict access to the residence." *See Tijerina v. Texas,* 334 S.W.3d 825, 834 (Tex. App. — Amarillo 2011, *writ ref'd*); *Washington v. State,* 152 S.W.3d 209, 214-15 (Tex. App. – Amarillo 2004, *no pet.*)./[6]

Simpson testified in his deposition that he did not see anyone commit a crime, and did not intend to arrest anyone for any crime, even after he had finished speaking with Campbell's neighbors and with Campbell and Womack.  Given Plaintiffs' allegations that neither officer could have seen Campbell's pistol, it is unreasonable to dispute that Campbell had the right to deny consent to entry into and access to the inside of his home.  It is undisputed that he firmly did so before the officers entered his home.

Further, it can not be disputed that a seizure of all three Plaintiffs occurred.  "A seizure of

---

[6]      At all relevant times, all three of the Plaintiffs were either inside the home or were close to the home but just outside, either on the front porch or relatively near it.  Simpson admitted in his deposition that he never observed Campbell outside his home's front yard fence.  The front yard of a home is the curtilage thereof.  *Cooksey v. The State of Texas,* No. 04-10-00424-CR (Tex. App — San Antonio, May 11, 2011)(*citing Oliver v. United States,* 466 U.S. 170, 182 n.12 (1984)).

the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas,* 538 U.S. 626, 123 S.Ct. 1843, 1844, 155 L.Ed.2d 814 (2003)(internal quotations omitted).   However, an encounter between an officer and an individual "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).   If, as here, a seizure takes place, the Court must next determine whether that seizure was unreasonable. *See Illinois v. McArthur,* 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) ("[The Fourth Amendment's] central requirement is one of reasonableness.").   Under the facts as alleged by Plaintiffs, which the Court must at this stage accept, neither officer had permission or legal cause to enter the home or to seize anyone therein, to subsequently search the home and containers located therein, or to seize property located inside the home.   Under the facts as alleged here, the entry into the home and the searches and seizures were unreasonable and nonconsensual.

### Use of Excessive Force to Seize and Arrest

The relevant excessive force question is whether, taking Plaintiffs' version of the facts as true, the force used by the officers was both excessive to the need and objectively unreasonable. In Fourth Amendment excessive force cases, the reasonableness question amounts to "whether the totality of the circumstances justifies a particular sort of seizure." *Tennessee v. Garner,* 471 U.S. 1, 8-9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).   Important factors to be considered include the severity of the crime, whether the actor poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham, supra,* 490 U.S. at 396 (1989).   Since the Court finds that Plaintiffs have alleged a violation of clearly established constitutional rights, it must determine whether Defendants'

18

conduct was objectively reasonable as a matter of law in light of the clearly established law at the time of the incident. *Jacobs v. West Feliciana Sheriff's Dept.*, 228 F.3d 388, 393 (5th Cir. 2000).

An action is objectively unreasonable in light of clearly established law if a reasonable official would understand that the act violates a clearly established right. *Flores v. City of Palacios, Texas*, 381 F.3d 391, 400 (5th Cir. 2004). The relevant question is whether, taking Plaintiffs' version of the facts as true, the force used by the officers was both excessive to the need and objectively unreasonable. Based upon the facts as presented by Plaintiffs, and the officers' admissions in their depositions, Campbell had not and was not committing a crime. Simpson conceded in his deposition that he did not see Plaintiff Campbell commit a crime. Neither did Lewis.

Under the facts of this case, none of the Plaintiffs was an immediate threat to the safety of the officer or to others. Campbell contends he did not hit anyone, that he posed no objective threat to either of the officers or to others, and was not resisting a verbal command to stop and permit himself to be arrested, or was attempting to evade arrest. Defendant Simpson testified that Campbell did not threaten him or anyone else, and admitted that he never verbally commanded Campbell to stop and allow himself to be handcuffed or arrested.

Contrary to the facts alleged by Plaintiffs, the officers' claim they *might have* subjectively felt threatened by Campbell because he had a pistol tucked into his rear waistband. Setting aside the disputed contentions about when the officers first saw Campbell's pistol, it can not be reasonably contested that Campbell did not pull the weapon, brandish it,[7] or display it in

---

[7]      "Brandish" means: "to shake or wave (as a weapon) menacingly; 2: to exhibit in a ostentatious or aggressive manner." *Hillburn v. State*, 627 S.W.2d 546, 548 (Tex.App.—Amarillo 1982)(*citing* Webster's New Collegiate Dictionary (8th ed. 1979)).

a threatening manner.

The question is whether the use of force was objectively reasonable under the circumstances *alleged by Plaintiffs,* not whether the force was justified based on the officers' later-claimed interpretation of the situation at the time. *See Autin v. City of Baytown,* 174 Fed.Appx. 183, 185 (5th Cir. 2005)("The relevant question is whether, taking [Plaintiff] Autin's version of the facts as true, the force used by [Officer] Aldred was both excessive to the need and objectively unreasonable. ... The question is whether the use of force was objectively reasonable under the circumstances as alleged by Autin, not whether the force was justified based on Aldred's claimed interpretation of the situation at the time."); *Stroik v. Ponseti,* 35 F.3d 155, 158 (5th Cir. 1994)(stating that "the only question is whether [Officer] Ponsetti's use of force was 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [the officer's] underlying intent or motivation").

Defendant Simpson testified in his deposition that he thought he could arrest Campbell if Simpson had a belief that there was a threat of continuing violence. Taking Plaintiffs' version of the facts as true, and the admissions made by both officers in their depositions, the Court concludes that the need to arrest Campbell, and the level of force allegedly used by the officers to do so, was both excessive to the need and objectively unreasonable. Repeatedly tasering a suspect in the back *after* he is handcuffed and under the control of an officer, as Plaintiffs allege was done to Campbell, is not objectively reasonable in light of clearly established law as of July 7, 2009, the date of this incident. *Autin v. City of Baytown, supra* at 185-86 (2005)./[8]

---

[8]   "Not only was [Plaintiff] Autin not resisting arrest, but [Officer] Aldred's tasing of her was allegedly the first indication he gave to her that she was doing anything wrong. He tased her when her back was to him, he gave her no notice of his intention to do so, and he continued to tase her repeatedly, even after she was subdued on the ground. In judging the objective reasonableness of Aldred's use of force, it should not be forgotten that Autin was fifty-nine years old and five feet two inches tall. Given these alleged facts, Aldred's use of force was both excessive to the need and objectively unreasonable.

There is sufficient competent summary judgment evidence in the record of this case to create and support a genuine issue of material fact on this claim. Further supporting Plaintiffs' claims is relevant evidence which is missing from this record, lost under circumstances which might be sufficient to warrant a spoliation jury instruction in Plaintiffs' favor.

Defendant Simpson testified at his deposition that there were audio and video recordings made by the responding police vehicles' recording equipment, which recorded the encounters between Plaintiffs and the Defendants. Simpson's audio possibly also recorded other persons who are not parties to this lawsuit – the neighbors who were witnesses to earlier incidents in question. Presumably, those recordings might reveal relevant evidence supporting each of the parties' differing versions of the sequences of critical events, their differing recollections of who said what to whom, when, and, equally important, what alleged verbal commands were or were not given and/or disobeyed during the arrests. That evidence was at all times in the custody and control of the Defendants. Both Simpson and Lewis watched and listened to it after they tagged it as evidence, while they were preparing their police reports.

Simpson testified that *after* he had received notice of this lawsuit, it was discovered that *all* of that evidence is missing. He looked for it, and could not find it. Defendants have not explained why all copies, which were in the sole possession and control of the Lubbock Police Department and which are normally preserved as criminal case evidence, plus all *additional* copies of the police recordings which were turned over by the Lubbock Police Department to the Lubbock County District Attorney's office for the DA's use as criminal trial evidence in the charged cases, are missing, apparently destroyed or lost. Presumably that relevant, discoverable and material audio and video evidence might be favorable to the Plaintiffs', or to the

---

The district court correctly found that the facts as alleged show a violation of Autin's Fourth Amendment rights."

Defendants', differing versions of events.

*Seizure and Arrest of Campbell-Ortega and Womack*

Plaintiffs argue that the arrests of Campbell-Ortega and Womack resulted from their attempts to stop the officers from seizing and arresting Campbell. The allegedly illegal search of the home and the seizures of legally-possessed weapons flowed from the decision to arrest Campbell.[9] The decisions and actions of Officers Simpson and Lewis to arrest Campbell precipitated the subsequent illegal arrests, searches, and seizures.

A jury trial may reveal facts that justify the use of force, the arrests, and/or the search and seizures from the home. At the summary judgment stage, however, the court is bound to take Plaintiffs' version of the facts as true. Given those facts, nothing about the situation facing Simpson and Lewis would have indicated to a reasonable officer that repeatedly tasering a man in the back during the attempt to effect an arrest, after forcing him to the ground, and again after he was handcuffed and under their control, was lawful conduct.

Given Plaintiffs' version of events, there was no need for: a) entry into the home, b) the use of force to arrest a non-resisting Campbell, c) the resulting seizure and arrest of Plaintiffs Womack or Campbell-Ortega, or d) for any of the criminal charges to be brought, especially since no charges were ever brought against Campbell regarding the alleged assault on his neighbor.

Accepting Plaintiffs' version of events, there was no objectively reasonable need for the resulting warrantless search inside Plaintiff Campbell's home, or the alleged seizure of the

---

[9]    The record regarding the weapons allegedly seized is unclear. In addition to the pistol and revolver, Campbell had rifles stored in what has variously been referred to as a gun safe, case or cabinet located inside the home. The pistol and revolver were seized as evidence, and removed from the home. The rifles were allegedly left in the home, but a police record was maintained of their existence. It is further alleged that some or all of Campbell's weapons were checked against police criminal databases. The pistol and revolver were eventually returned to Campbell, according to his deposition testimony.

property from his home.

*Protective Sweep Search and Exigent Circumstances*

One well-recognized exception to the warrant required before police can enter a home applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *see also Payton, supra,* at 590, 100 S.Ct. 1371 (1980)("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant").

The Supreme Court has identified several exigencies that may justify a warrantless search of a home. *See Brigham City, supra,* 547 U.S. at 403 (2006). Under the "emergency aid" exception, for example, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Ibid.; see also, e.g., Michigan v. Fisher, supra,* 558 U.S. at ___, 130 S.Ct. at 548 (2009)(upholding warrantless home entry based on emergency aid exception). Police officers may enter premises without a warrant when they are in "hot pursuit" of a fleeing felony suspect. *See United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)(inside-the-home arrest of a heroin dealer). And the need "to prevent the imminent destruction of evidence" has been recognized as a sufficient justification for a warrantless search. *Brigham City, supra*, at 403, 126 S.Ct. 1943; *see also Georgia v. Randolph,* 547 U.S. 103, 116, n. 6, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006); *Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

Lead Officer Simpson testified in his deposition that at the time he made the decision to enter the home he did not believe that the safety of the officers or others was in danger. He testified that at no time had he decided to arrest Campbell for assault of his neighbor. He

testified that he entered the home because he had been trained to "fear the unknown" and, in his mind, he did not know what Campbell would do after he entered his home.  He knew that Campbell had a glass of beer in his hand, but did not know how many beers Campbell had consumed.  Simpson did not know that Campbell *was* intoxicated, testifying that he thought Campbell was angry and *might be* intoxicated because he had a glass of beer in his hand.  He never saw Campbell drinking the beer, and until he entered the home Simpson stood five or more feet from Campbell when speaking to him.

Officer Lewis testified that he entered the home after Simpson because he was in "hot pursuit" of Campbell.  He testified at his deposition that at the time he followed Simpson into the home, Lewis had not personally observed or been told by Simpson that Campbell had committed a crime.  Both officers testified that they thought it illegal for a concealed handgun license holder to be intoxicated while in possession of a handgun, however, again, Plaintiffs specifically allege that neither officer saw, or could have seen, Campbell's pistol because at no time was it ever exposed to either officer.  Plaintiffs say that neither officer ordered Campbell to not enter his home to retrieve his driver's license, or to stay outside his home.  Campbell denies that he was intoxicated at the time.

Taking the facts as alleged by Plaintiffs as true, if the officers did not have probable cause to enter the home (after the firm denial of consent to entry), did not have probable cause at the time of entry to arrest Campbell, and did not have, as they admit, any reasonable fear he might use his firearm against them, or flee, then entry into the home was objectively unreasonable.  If entry was unnecessary and legally impermissible, then a protective sweep of the home was not permissible.  Especially where, as here, there is no allegation of any other suspect or assailant, known or unknown to the officers.

The Defendants do not argue that a protective sweep was necessary because someone

else the police wanted to question or arrest could be, or was, hiding inside the home.  They do not allege that officers responding to Womack's disturbance complaint could hear within Campbell's home an altercation occurring, or some kind of fight inside, some public disturbance or breach of the peace, or the need to quell violence inside Campbell's home.  Simpson admitted those disturbances came from the neighbor's home.

There is no allegation here that Campbell was going inside to destroy evidence, that emergency aid needed to be rendered to someone inside, that Campbell was a fleeing felony suspect and that the officers reasonably feared for their safety because a firearm was present, tucked into Campbell's rear waistband, or that there was a risk Campbell was trying to or would escape.  *Cf. Kentucky v. King*, ___ U.S. ___, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) (warrantless entry to prevent the destruction of evidence by a persistent felony offender is allowed where police do not create the exigency through an actual or threatened Fourth Amendment violation); *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 1094, 108 L.Ed.2d 276 (1990) ("A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."); *United States v. Maldonado,* 472 F.3d 388, 393 (5th Cir. 2006)("The government has the burden of proving the existence of exigent circumstances."); *U.S. v. Rico,* 51 F.3d 495, 500-01 (5th Cir. 1995) ("Although presumptively *un*reasonable, a warrantless entry will survive constitutional scrutiny if, *inter alia,* "exigent circumstances exist to justify the intrusion."  The burden is on the government to prove the existence of the exigency.")(emphasis in original)(citation omitted); *U.S. v. Mendoza-Burciaga,* 981 F.2d 192, 196 (5th Cir. 1992)("Officers may legally search for weapons *if* they believe that the safety of themselves or others is in danger," *citing Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983))(emphasis added).

It is not disputed that Campbell laid his handgun on the kitchen table, and then immediately turned away from that table, left the kitchen, reentered the living room and was confronted therein by the officers. Plaintiffs allege that at no time could either of the officers see that Campbell had a firearm tucked into the rear of his pants, saying they decided to enter the home anyway for other reasons. Defendants do not argue that once they were inside the living room one of the other Plaintiffs tried to go near, or into, the kitchen, or towards the kitchen table area. Therefore, the Plaintiffs' right to be secure in their persons and property were both clearly established and arguably violated under the particular circumstances alleged here.

### False Police Report and Malicious Prosecution

There is no immunity available to a peace officer who falsifies a police report with the intention that criminal charges be brought against another, for the purpose of protecting the officer from civil liability for his use of excessive force, or to otherwise wrongfully procure a criminal prosecution or conviction. *See Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)(knowingly false witness testimony induced and given by state's agent violates a defendant's Fourteenth Amendment rights)./[10] Taking Plaintiffs' version of the facts as true, the Court concludes that the officers are not entitled to a grant of summary judgment on this claim.

---

[10]   *Cf. Brown v. Miller,* 519 F.3d 231, 237 (5th Cir. 2008) ("A criminal defendant's due process rights are violated when the government obtains a conviction with testimony that government agents know is false. … We therefore hold that the deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights, and that a reasonable laboratory technician in 1984 would have understood that those actions violated those rights."); *Limone v. Condon,* 372 F.3d 39, 44-45 (1st Cir. 2004)("if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence . . .."); *Keko v. Hingle,* 318 F.3d 639, 644 (5th Cir. 2003)(government agents and private individuals are not entitled to absolute immunity from §1983 civil rights lawsuits for pre-testimonial investigative activities); *Geter v. Fortenberry,* 849 F.2d 1550, 1559 (5th Cir. 1988)( "a police officer cannot avail himself of a qualified immunity defense if he" falsifies a police report by, for example, "procur[ing] false identification by unlawful means . . ..").

26

*Conclusion*

Defendants Lewis and Simpson assert an entitlement to qualified immunity on all claims asserted against them in their individual capacities.  Genuine issues of material fact exist which preclude granting summary judgment to Officers Simpson and Lewis on the Plaintiffs' unlawful entry, unlawful search and seizure, unlawful arrest, excessive force, and malicious prosecution claims.

Defendants' motion for summary judgment is therefore denied.

It is SO ORDERED.

Signed this the _____ day of September, 2012.


**MARY LOU ROBINSON**
United States District Judge

27